**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| MEDIAPOINTE, INC., | **Case No. 6:21-cv-855** |
| Plaintiff, | |
| v. | COMPLAINT FOR PATENT INFRINGEMENT |
| MICROSOFT CORP., | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which Plaintiff MediaPointe, Inc. ("MediaPointe"), makes the following allegations against Defendant Microsoft Corporation ("Microsoft"):

### BACKGROUND

1.      This Complaint asserts causes of action for infringement of the following United States patents owned by MediaPointe: United States Patent Nos. 8,559,426 ("'426 Patent") and 9,426,195 ("'195 Patent") (collectively, the "Asserted Patents").

### THE PARTIES

2.      Plaintiff MediaPointe is a corporation organized and existing under the laws of California, with a principal place of business at 3952 Camino Ranchero, Camarillo, California 93012.

3.      Defendant Microsoft is a corporation organized under the laws of the State of Washington, with a principal place of business at One Microsoft Way, Redmond, Washington

98052. Microsoft may be served through its registered agent, The Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

5.    This Court has personal jurisdiction over Microsoft because, *inter alia*, Microsoft has minimum contacts with Texas and this district such that this venue is a fair and reasonable one. Microsoft conducts substantial business in this forum, including (i) engaging in the infringing conduct alleged herein and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, recruiting Texas residents for employment inside or outside this District, and/or deriving substantial revenue from goods and services provided to individuals in Texas and in this District.

6.    Venue in the Western District of Texas is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

7.    Upon information and belief, Microsoft has committed infringing acts in this judicial District by making, using, offering for sale, selling, or importing products or services that infringe the Asserted Patents (as defined herein), or by inducing others to infringe the Asserted Patents.

8.    Upon information and belief, Microsoft has a regular and established physical presence in the district, including, but not limited to, ownership of or control over property, inventory, or infrastructure. Microsoft maintains offices in this District, including, but not limited to, locations at 10900 Stonelake Boulevard, Suite 225, Austin, Texas 78759;[1] Concord Park II,

---

[1] *See* https://news.microsoft.com/2000/01/05/microsoft-opens-austin-texas-facility/ (last accessed August 16, 2021).

401 East Sonterra Boulevard, Suite 300, San Antonio, Texas 78258; 5150 Rogers Road, San Antonio, Texas 78251; 5200 Rogers Road, San Antonio, Texas 78251;[2] and 3823 Wiseman Blvd, San Antonio, Texas 78251,[3] each of which lie within this federal judicial District.

9.      Moreover, Microsoft's servers located in this District deliver content to residents in this District. Those physical servers are Microsoft's regular and established places of business.

10.     Because Microsoft uses its local servers to provide content to residents of this District, Microsoft's infringement of MediaPointe's patents—which, as described below, relate to the delivery of content—is substantially related to its regular and established places of business in this District. Many of the claims discussed herein relate to Microsoft's server architecture generally and its localized, hosted servers specifically.

11.     In other recent actions, Microsoft has either admitted or not contested that this federal judicial district is a proper venue for patent infringement actions against it. *See*, *e.g.*, *Thompson v. Microsoft Corp.*, No. 1:19-cv-00680-RP, Dkt. No. 6; *Panther Innovations v. Microsoft Corp.*, No. 6-20-cv-01071, Dkt. No. 14; *Exafer Ltd. v. Microsoft Corp.*, No 1-20-cv-00131, Dkt. No. 15; *WSOU Investments, LLC v. Microsoft Corp.*, No. 20-cv-00464, Dkt. No. 20; *Zeroclick, LLC v. Microsoft Corp.*, No. 20-cv-00272, Dkt. No. 14; and *California Institute of Technology v. Microsoft Corp.*, No. 21-cv-00276, Dkt. No. 22.

## DEFENDANT'S AZURE CONTENT DELIVERY NETWORK AND FRONT DOOR NETWORK

12.     The Internet and applicable technologies such as Transfer Control Protocol/Internet Protocol (TCP/IP) were originally designed according to the end-to-end principle, whereby the

---

[2] *See* https://www.datacenterhawk.com/providers/microsoft-azure (last accessed August 16, 2021).

[3] *See* https://www.virtualbx.com/industry-news/san-antonio-microsoft-reaches-mid-point-on-86m-expansion-in-westover-hills/ (last accessed August 16, 2021).

core network is specialized, simplified, and optimized to only forward data packets between a host

and an end client. As the Internet became more popular, issues began to arise. For example, a

single server in Washington state would have to serve customers that are distributed nationally and

internationally. The data being transmitted passes through various asynchronous transmission

devices, such as routers, switches, hubs, and bridges, with each device adding to the latency of the

transmitted data packets. The Internet was originally designed to carry text-based documents such

as email. Performance of the Internet using email is not critically time dependent, thus the intrinsic

latency of the Internet infrastructure is acceptable, and the utilization of bandwidth is minimal.

However, an increase in data volume and demand results in performance problems for real-time

applications where network timing and sustained data rates are critical. Such applications can

include streaming media (including, for example, audio, video, and metadata), web-conferencing,

and Internet telephony. In prior art data distribution networks, the distribution of data is seriously

restricted due to lack of bandwidth, which leads to bottlenecks during transmission from a content

server to an Internet Service Provider, and ultimately to the end users. Bottlenecks reduce viewing

quality and access speeds, and increase viewing costs as ISPs pass on bandwidth costs to end users.

Furthermore, when data packets are lost, the end user's request for retransmission of that data must

be sent back to the content server, and this retransmission introduces redundant bandwidth

utilization, affecting all users connected to that content server. Because bandwidth constraints are

defined by the lowest capacity hop between the content source and the end user, capacity additions

to one Internet segment does not necessarily improve end-to-end capacity.

13.     Content Delivery Networks (CDN) came into existence as a means to alleviate

bottlenecks on the Internet through the use of delivery nodes in multiple locations. A CDN is a

globally distributed network of servers that can deliver content to consumers. CDNs store cached

content on an edge server's point of presence (POP) locations that are close to consuming users, thereby minimizing network latency. For example, one could place nodes in San Antonio, Texas that would more efficiently serve customers located close to the San Antonio area. Other nodes can be distributed nationally and internationally such that users access data from nodes located closer to them.

14.     Microsoft Azure is a cloud computing service created by Microsoft to allow users to build, test, deploy, and manage applications and services through Microsoft-managed data services. Microsoft Azure provides traditional cloud computing services such as software as a service (SaaS), platform as a service (PaaS), and infrastructure as a service (IaaS), allowing users to leverage Microsoft's servers for their own usage. Among the many services provided by Microsoft Azure are Microsoft Azure Front Door and Microsoft Azure Content Delivery Network (CDN).

15.     Microsoft operates and sells access to Microsoft Azure Front Door and to the Microsoft Azure CDN to provide load balancing, routing, caching, and other services to customers via servers located in this District and throughout the United States (the "Microsoft Servers"). The Microsoft Servers incorporate technology that uses nodes that relay a continuous stream of data from a content provider, replicate the continuous stream of data, and transmit the replicated stream of data to at least one other client, pursuant to the inventions disclosed in the Asserted Patents.

16.     Microsoft describes Azure Front Door as "a secure cloud CDN service" that "combines intelligent threat protection and modern CDN technology in a tightly integrated service that's easy to setup, deploy, and manage."[4] As of the time of this Complaint, Azure Front Door

---

[4] https://azure.microsoft.com/en-us/updates/azure-front-door-standard-and-premium-now-in-public-preview/ (last accessed August 16, 2021).

has 116 edge locations across 100 metro cities.[5]

17.    Microsoft describes the operations of Azure Front Door as follows:[6]

Azure Front Door is a global, scalable entry-point that uses the Microsoft global edge network to create fast, secure, and widely scalable web applications. With Front Door, you can transform your global consumer and enterprise applications into robust, high-performing personalized modern applications with contents that reach a global audience through Azure.



18.    Microsoft describes Azure Front Door as having four different traffic routing methods:[7]

- Latency—this routing ensures that requests are sent to the lowest latency backends acceptable within a sensitivity range;
- Priority—a user can assign priorities to the backends to configure a primary backend to service all traffic, where a secondary backend can be a backup in case the primary backend becomes unavailable;

---

[5] https://docs.microsoft.com/en-us/azure/frontdoor/standard-premium/edge-locations (last accessed August 16, 2021).
[6] https://docs.microsoft.com/en-us/azure/frontdoor/front-door-overview (last accessed August 16, 2021).
[7] https://docs.microsoft.com/en-us/azure/frontdoor/front-door-routing-methods (last accessed August 16, 2021).

- Weighted—a user can assign weights to backend to distribute traffic across a set of backends;

- Session Affinity—a user can configure session affinity for frontend hosts or domains to ensure requests from the same end user get sent to the same backend.

19.     Microsoft describes Azure CDN as allowing users to "reduce load times, save bandwidth, and speed responsiveness."[8] In addition, Azure CDN "accelerates load times, cuts latency, and helps to improve user experience for dynamic web applications and websites" while integrating "seamlessly with media workflows, enabling real-time performance for any streaming content—live or on-demand."

20.     Azure CDN can be used in conjunction with Azure Front Door.[9] For example, Microsoft states that a user "can ensure that Front Door will route your client requests to the fastest and most available application backend." An exemplary application backend is Azure Media Services Streaming Endpoint, which is a streaming service that can deliver content directly to a client player application, or to a content delivery network (CDN) for further distribution."

---

[8] https://azure.microsoft.com/en-us/services/cdn/ (last accessed August 16, 2021).
[9] https://techcommunity.microsoft.com/t5/azure-developer-community-blog/azure-on-the-cheap-azure-front-door-caching-vs-azure-cdn/ba-p/1372262 (last accessed August 16, 2021).



21.     Microsoft further describes the integration of Azure CDN and Azure Front Door with the following diagram that demonstrates a sample architecture of media content ingestion to delivery:[10]



22.     Microsoft describes the ability to assign priorities to backends. This allows a user to configure a primary backend to service all traffic, then a backup backend in case the primary

---

[10] https://azure.microsoft.com/en-us/blog/fast-and-optimized-connectivity-and-delivery-solutions-on-azure/ (last accessed August 16, 2021).

backend becomes unavailable.[11] Such a configuration allows one to configure a first, higher quality of service network link and a second, less optimal network link that is used when a higher priority client requests use of the higher quality of service network link.



23.    Microsoft describes the operation of Azure CDN as follows:[12]

## How it works



1. A user (Alice) requests a file (also called an asset) by using a URL with a special domain name, such as *<endpoint name>*.azureedge.net. This name can be an endpoint hostname or a custom domain. The DNS routes the request to the best performing POP location, which is usually the POP that is geographically closest to the user.

2. If no edge servers in the POP have the file in their cache, the POP requests the file from the origin server. The origin server can be an Azure Web App, Azure Cloud Service, Azure Storage account, or any publicly accessible web server.

3. The origin server returns the file to an edge server in the POP.

4. An edge server in the POP caches the file and returns the file to the original requestor (Alice). The file remains cached on the edge server in the POP until the time-to-live (TTL) specified by its HTTP headers expires. If the origin server didn't specify a TTL, the default TTL is seven days.

5. Additional users can then request the same file by using the same URL that Alice used, and can also be directed to the same POP.

6. If the TTL for the file hasn't expired, the POP edge server returns the file directly from the cache. This process results in a faster, more responsive user experience.

### THE ASSERTED PATENTS

24.     The Asserted Patents teach a solution to a problem inherent to computer technology: how to improve latency and load balancing in content delivery networks. By providing novel and inventive systems and methods for relaying data from a content provider to clients, the focus of the patented claims is on an improvement to network functionality itself.

25.     By way of a non-limiting example and as the Asserted Patents describe, one issue with aforementioned prior art transmission schemes is that they do not provide for the most time- or cost-effective routing of content to end users. In other words, the data travels through more

devices (and thus more hops) than would otherwise be optimal. This not only leads to a reduction in viewing quality and access speed, but also reduces the ability of content providers to track and manage the distribution of proprietary content. The most common method that ISPs employ to manage bandwidth constraints and inefficient routing is to deploy dedicated streaming media servers (SMS) to store and redistribute content to ISP customers, regionally. There are a number of problems with this approach. Typically, an ISP can manage the aggregated bandwidth requirement of a plurality of clients streaming a plurality of data packets within the local area network (LAN) if the data is from a server located within the ISP LAN. The cost to maintain and manage such servers is high. Additionally, content providers are often reluctant to provide copyrighted content to autonomous operators where liability for royalties or licensing fees could exist. A further disadvantage of having an autonomous local server is that the storage capacity of the server often limits the availability of content, forcing ISP clients to access streamed media through the wide area network (WAN).

26.    The Asserted Patents attempt to overcome such problems with data transmissions over the Internet by providing an intelligent distribution network (IDN) which optimizes delivery of content to large and diversely located clients by minimizing the impact of network irregularities, minimizing bandwidth usage as compared to data delivery from a single content source to multiple simultaneous viewers, minimizing packet loss resulting in decreased latency in data stream delivery, and maximizing sustained data rates to clients. The claimed invention achieves this through the configuration of two main components, at least one IDN node and at least one IDN management center. When a client requests data from anywhere on the Internet, the client is directed to an IDN management center which, in turn, refers the client to its best performing or optimal IDN node. The best performing IDN nodes and links are identified by a mapping engine

which maps trace routes between the IDN management center, the IDN nodes, the various transmission devices, and the client, to determine the optimal routing with which to deliver the content. The IDN then relays the data to the client through the optimal IDN node and route.

27.     In addition, the Asserted Patents provide that the IDN node may be configured to replicate a stream of data from the content provider in response to subsequent requests for the same content. Thereafter, the replicated stream of data may be efficiently transmitted to additional clients in response to subsequent requests.

## COUNT ONE
### Infringement of the '426 Patent

28.     Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

29.     On October 15, 2013, the United States Patent and Trademark Office duly and legally issued the '426 Patent entitled "System and Method For Distribution of Data Packets Utilizing An Intelligent Distribution Network." A true and correct copy of the '426 Patent is attached as Exhibit A to this Complaint.

30.     MediaPointe owns all rights, title, and interest in and to the '426 Patent, including the right to assert all causes of action under the '426 Patent and the right to any remedies for the infringement of the '426 Patent.

31.     The '426 Patent generally relates to technology that efficiently distributes streamed media content to diversely located client locations via an intelligent distribution network (IDN). The claims of the '426 Patent, including claim 1, recite novel and inventive systems and methods for the distribution of data.

32.     For example, claim 1 of the '426 Patent recites:

1. A system comprising:

a management center;

a plurality of nodes configured to: relay a continuous stream of data from a content provider to a first client in response to an initial request for the continuous stream of data, replicate the continuous stream of data, and transmit the replicated stream of data to at least one other client;

wherein the management center comprises a mapping engine that is configured to map trace routes between the management center, at least one of the nodes, and at least the first client so as to determine one or more optimal routes from the management center to the first client via the at least one of the nodes, and configured to direct a node relaying the continuous stream of data from the content provider to the first client to replicate the continuous stream of data from the content provider, in response to subsequent requests for the continuous stream of data, while the node is relaying the continuous stream of data from the content provider to the first client, and transmit the replicated stream of data to the at least one other client in response to the subsequent requests for the continuous stream of data; and

wherein the management center is configured to downgrade lower priority clients from a higher quality of service network link to a less optimal network link when a higher priority client requests use of the higher quality of service network link.

33.     Microsoft has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 1, of the '426 Patent in violation of 35 U.S.C. § 271(a). For example, Microsoft has, without authorization, operated, used, and sold, and continues to operate, use, and sell, access to its Azure Front Door and Azure CDN services that includes the Microsoft Servers ("'426 Accused Instrumentalities"), which are capable of operating in the manner described in the claims of the '426 Patent, thereby infringing at least claim 1 of the '426 Patent. Microsoft's infringing use of the '426 Accused Instrumentalities includes its internal use and testing of the '426 Accused Instrumentalities.

34.     The '426 Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '426 Patent, including at least claim 1.

35.     By way of a non-limiting example, the '426 Accused Instrumentalities include a system that includes a management center. The '426 Accused Instrumentalities further include a plurality of nodes (for example, Azure Front Door's 116 different edge locations) that are capable of or configured to relay a continuous stream of data and transmit the replicated stream of data to at least one other client, to determine the optimal routing with which to deliver the content and relay the data to the client through the optimal IDN node and route.

36.     Further, the management center of the '426 Accused Instrumentalities comprises a mapping engine that is capable of or configured to map trace routes between the management center, at least one of the nodes, and at least the first client. The '426 Accused Instrumentalities enable users to choose amongst four available routing methods. These include methods based solely on latency times as well as user configureable methods.

37.     Further, the management center of the '426 Accused Instrumentalities has the capability of and/or is configured to downgrade lower priority clients from a higher quality of service network link to a less optimal network link. The traffic routing methods include a "Priority" method that provides for a prioritized service. Microsoft also offers different tiers for premium content at different pricing. It provides dynamic site acceleration to its premium customers, which allows for a high quality experience and access to optimal network link access.

38.     Since having notice of the '426 Patent, Microsoft has indirectly infringed and continues to indirectly infringe the '426 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including OEMs, agent-subsidiaries, affiliates, partners, service providers, manufacturers, importers, resellers, customers, and/or end users, in this district and elsewhere in the United States, through the dissemination and maintenance of the Accused Instrumentalities and the creation and dissemination of promotional

and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to such products with knowledge and the specific intent that its efforts will result in the direct infringement of the '426 Patent.

39.     For example, Microsoft took active steps to encourage end users to utilize its Azure network in the United States in a manner it knows will directly infringe each element of at least claim 1 of the '426 Patent, including by selling access to its Azure CDN and Azure Front Door services and encouraging users to operate devices on that network, despite knowing of the '426 Patent and the fact that such usage of Azure CDN and Azure Front Door will infringe the '426 Patent. The infringing aspects of the '426 Accused Instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

40.     Such active steps include, for example, advertising and marketing Microsoft's Azure services, marketing and selling of devices capable of or intended for use on Azure, publishing manuals and promotional literature describing and instructing users to utilize Azure, and offering support and technical assistance to its customers that encourage use of Azure in ways that directly infringe at least claim 1 of the '426 Patent.

41.     Microsoft undertook and continues to undertake the above-identified active steps after receiving notice of the '426 Patent and how those steps induce infringement of the '426 Patent.

42.     Microsoft's acts of infringement have caused and continue to cause damage to MediaPointe, and MediaPointe is entitled to recover from Microsoft the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '426 Patent, together with interest and costs as fixed by the Court. Microsoft's infringement of MediaPointe's rights under the '426 Patent

will continue to damage MediaPointe, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

43.     Microsoft has had notice of the '426 Patent at least as of the date of this Complaint.

## COUNT TWO
## Infringement of the '195 Patent

44.     Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

45.     On August 23, 2016, the United States Patent and Trademark Office duly and legally issued the '195 Patent entitled "System and Method for Distribution of Data Packets Utilizing An Intelligent Distribution Network." A true and correct copy of the '195 Patent is attached as Exhibit B to this Complaint.

46.     MediaPointe owns all rights, title, and interest in and to the '195 Patent, including the right to assert all causes of action under the '195 Patent and the right to any remedies for the infringement of the '195 Patent.

47.     The '195 Patent generally relates to technology that efficiently distributes streamed media content to diversely located client locations via an intelligent distribution network (IDN). The claims of the '195 Patent, including claim 1, recite novel and inventive systems and methods for the distribution of data.

48.     For example, claim 1 of the '195 Patent recites:

1.  A method comprising:

receiving an initial request for media content from a first client, the request being received by a management center;

directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, the first client being directed to the node by the management center;

relaying the content stream from the content provider to the first client via the selected node;

replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client; and

transmitting the replicated content stream from the selected node to at least one other client in response to the subsequent requests for the media content.

49.     Microsoft has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 1, of the '195 Patent in violation of 35 U.S.C. § 271(a). For example, Microsoft has, without authorization, operated, used, and sold, and continues to operate, use, and sell, access to its Azure Front Door and Azure CDN services that includes the Microsoft Servers ("'195 Accused Instrumentalities"), which are capable of operating in the manner described in the claims of the '195 Patent, thereby infringing at least claim 1 of the '195 Patent. Microsoft's infringing use of the '195 Accused Instrumentalities includes its internal use and testing of the '195 Accused Instrumentalities.

50.     The '195 Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '195 Patent, including at least claim 1.

51.     By way of a non-limiting example, the '195 Accused Instrumentalities include a system that receives an initial request for media content from a first client, where the request is received by a management center. The management center directs the first client to one of a plurality of nodes (for example, the 116 different edge locations) that are configured to relay a content stream from a content provider to the first client.

52.     Further, the '195 Accused Instrumentalities include a management center that is capable of or configured to map trace routes between the management center, the node, and the first client, to determine the optimal routing with which to deliver the content and relay the data to

the client through the optimal IDN node and route . The '195 Accused Instrumentalities includes the ability of the user to choose amongst four different routing methods. These include methods based on latency times as well as user configurable methods. The available routing methods can be used by the management center to direct the first client to the node.

53.     Further, the '195 Accused Instrumentalities is capable of and/or configured to relay the content stream from the content provider to the first client via the selected node. The '195 Accused Instrumentalities nodes (also referred to as Points of Presence (POP)) are capable of requesting the content stream from the origin server, which then relays the content stream to the first client.

54.     Further, during the relaying of the content stream, the POP of the '195 Accused Instrumentalities is configured to replicate the content stream in response to subsequent requests for the media content. The POP is further configured to transmit the replicated content stream to at least one other client.

55.     Since having notice of the '195 Patent, Microsoft has indirectly infringed and continues to indirectly infringe the '195 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including OEMs, agent-subsidiaries, affiliates, partners, service providers, manufacturers, importers, resellers, customers, and/or end users, in this district and elsewhere in the United States, through the dissemination and maintenance of the Accused Instrumentalities and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to such products with knowledge and the specific intent that its efforts will result in the direct infringement of the '195 Patent.

56.     For example, Microsoft took active steps to encourage end users to utilize its Azure network in the United States in a manner it knows will directly infringe each element of at least claim 1 of the '195 Patent, including by selling access to its Azure CDN and Azure Front Door services and encouraging users to operate devices on that network, despite knowing of the '195 Patent and the fact that such usage of Azure CDN and Azure Front Door will infringe the '195 Patent. The infringing aspects of the '195 Accused Instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

57.     Such active steps include, for example, advertising and marketing Microsoft's Azure services, marketing and selling of devices capable of or intended for use on Azure, publishing manuals and promotional literature describing and instructing users to utilize Azure, and offering support and technical assistance to its customers that encourage use of Azure in ways that directly infringe at least claim 1 of the '195 Patent.

58.     Microsoft undertook and continues to undertake the above-identified active steps after receiving notice of the '195 Patent and how those steps induce infringement of the '195 Patent.

59.     Microsoft's acts of infringement have caused and continue to cause damage to MediaPointe, and MediaPointe is entitled to recover from Microsoft the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '195 Patent, together with interest and costs as fixed by the Court. Microsoft's infringement of MediaPointe's rights under the '195 Patent will continue to damage MediaPointe, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

60.     Microsoft has had notice of the '195 Patent at least as of the date of this Complaint.

## DEMAND FOR JURY TRIAL

61.     MediaPointe hereby demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## FEES AND COSTS

62.     To the extent that Microsoft's willful and deliberate infringement or litigation conduct supports a finding that this is an "exceptional case," an award of attorneys' fees and costs to MediaPointe is justified pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, MediaPointe prays for relief against Microsoft as follows:

a.     Declaring that Microsoft has infringed and/or induced the infringement of the Asserted Patents;

b.     Awarding MediaPointe damages arising out of this infringement of the Asserted Patents, including enhanced damages pursuant to 35 U.S.C. § 284, and prejudgment and post-judgment interest, in an amount according to proof;

c.     Permanently enjoining Microsoft, its respective officers, agents, servants, employees, and those acting in privity with it, from further infringement, including inducing infringement and contributory infringement, of the Asserted Patents;

d.     Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

e.     Awarding to MediaPointe such other costs and further relief as the Court deems just and proper.

Dated: August 16, 2021

Respectfully submitted,

By: */s/ Kalpana Srinivasan*

Kalpana Srinivasan (California 237460)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
ksrinivasan@susmangodfrey.com

Meng Xi (California 280099) (WDTX admission pending)
Thomas V. DelRosario (Texas 24110645)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713) 654-6666
mxi@susmangodfrey.com
tdelrosario@susmangodfrey.com

***Attorneys for Plaintiff MediaPointe, Inc.***